UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------X

MARVIN GRILL,                   :            Civil Action No. CV 03 3512

                                  :

                 *Plaintiff*,    :

                                    :

         - against -         :            **Plaintiff's Rule 56.1 Counter-Statement**

                                  :

TRIANS PHOTO LABS, INC. d/b/a    :

TRI COLOR IMAGING                :

                                  :

               *Defendant*.  :

----------------------------------------------------X

Plaintiff, MARVIN GRILL, hereby submits the following counter-statement of material facts, pursuant to Local Civil Rule 56.1, that concerning which there are genuine issues of material fact to be tried:

<u>Background</u>

1.      Plaintiff is currently seventy-six (76) years old, having been born on November 1, 1928.(Grill Tr.  P. 6)[1]

2.      Prior to becoming employed by defendant, plaintiff had extensive experience in the photography industry, not all of which required plaintiff to oversee sales.(Exhibit 1, Grill Tr. P. 24) Plaintiff was employed by Berkey National Professional Imaging, a people lab, as Vice President between January 1997 and July 1998.(Grill Tr. P. 24-25, 27-28, 30)  As Vice President, plaintiff directed sales and oversaw planning and budget performance.  He supervised twelve (12) managers and one hundred and ten (110) production personnel.  He oversaw operations at two retail stores. He also administered policy for collections and receivables.(Grill Tr. P. 28)

---

[1]  The transcript of the deposition of Marvin Grill is annexed to defendant's motion papers as Exhibit F.

Berkey National had bought out a company named Qualex in 1997.  Plaintiff was employed by Qualex from 1986 until the time it was taken over by Berkey National.(Grill Tr. P. 41-42) Plaintiff received a salary increase every year that he was employed by Qualex.  Salary increases were based on performance.(Grill Tr. P. 43) He also earned a bonus every year.  Bonuses were also based on performance.(Grill Tr. P. 43)

At Qualex, plaintiff served as Division General Manager.(Grill Tr. P. 44, Exhibit 2 [Plaintiff's Interrogatory Response] #2) He reported to a Sales Manager.(Grill Tr. P. 44) He was involved in sales to some degree.(Grill Tr. P. 45) He oversaw planning, budget performance and skill training for all levels of management.  Plaintiff conducted performance appraisal interviews and supervised eight (8) managers and eighty-five (85) production personnel.(Exhibit 2 [Plaintiff's Interrogatory Response] #2) He constantly communicated with the customers to maintain the existing client base.(Grill Tr. P. 46-47) He also frequently went to trade shows.(Grill Tr. P. 51)

Prior to working at Qualex, plaintiff was employed by Berkey Photo in Hempstead, New York from 1970 to 1986.(Grill Tr. P. 47, 151) He was considered the Plant Manager in charge of production.(Grill Tr. P. 48; Exhibit 2 [Plaintiff's Interrogatory Response] #2)

Eric Melconian (hereinafter "Eric") knew that plaintiff was in the photography business for many years and that he had run a competing lab.(Eric Tr. P. 45)[2] Elcid Melconian (hereinafter "Elcid") knew that plaintiff had a very good reputation.(Elcid Tr. P. 13)[3]

3.    Plaintiff became employed by defendant on January 7, 2001.  He continued working

---

[2]  The transcript of the deposition of Eric Melconian is annexed to defendant's motion papers as Exhibit H.

[3]  The transcript of the deposition of Elcid Melconian is annexed to defendant's motion papers as Exhibit I.

-2-

for defendant until May 7, 2002.(Grill Tr. P. 20)  When plaintiff was initially hired by defendant, his annual salary was $35,000.  In April 2001, it was increased to $40,000.

4.      The primary business purpose of defendant is to provide professional photographic services to professional photographers.    However, defendant also services amateur photographers.(Eric Tr. P. 13)

5.      Eric was born on March 7, 1969.  He is currently thirty-six years old.(Eric Tr. P. 8) Elcid was born on May 9, 1970.  He is currently thirty-five years old.(Elcid Tr. P. 7)

6.      Elcid and Eric are the sons of Nick Melconian (hereinafter "Nick").  They were the officers of defendant during plaintiff's employment.  Elcid was President (Eric Tr. P. 11-12; Elcid Tr. P. 8) and Eric was Vice President and Treasurer.(Grill Tr. P. 81; Eric Tr. P. 9)

7.      Nick was defendant's Chief Executive Officer.(Grill Tr. P. 81)

8.      Nick had moved to Florida in the early 1990s.(Nick Tr. P. 25)[4] Prior to his move to Florida, Nick was the President of defendant and was actively involved in defendant's business.

9.      After his move to Florida, Nick did not continue to be actively involved in the business.  He visited New York approximately four (4) times per year.(Eric Tr. P. 16-17)  During plaintiff's employment, Nick visited New York three (3) times.(Grill Tr. P. 84; Nick Tr. P. 26)

10.     Prior to being hired by defendant, plaintiff had known Nick for many years.  Plaintiff knew him through business and social arrangements.(Grill Tr. P. 95) Plaintiff would meet Nick at business meetings and conventions.  Nick and plaintiff would occasionally (once over 2-3 years) go to dinner with their wives.(Grill Tr. P. 96-97) That was the extent of the social relationship.  Plaintiff

---

[4]  The transcript of the deposition of Nick Melconian is annexed to defendant's motion papers as Exhibit G.

did not consider the social relationship to be a close one.(Grill Tr. P. 96; Nick Tr. P. 38-39)

Plaintiff also knew Eric and Elcid from meetings and conventions.(Grill Tr. P. 97) Plaintiff's step-daughter and Eric had previously dated.(Grill Tr. P. 98-99) Prior to the time that plaintiff started working for defendant, he had met Eric approximately ten (10) times.(Eric Tr. P. 41) Most of the meetings were at trade shows.(Eric Tr. P. 43-44) Plaintiff had met Elcid approximately five (5) to eight (8) times.(Elcid r. P. 11) All of these meetings were business related.(Elcid Tr. P. 11) Plaintiff did not consider his relationships with Eric and Elcid to be social.

### Plaintiff's Hiring

11.     On January 4, 2001, plaintiff received a telephone call from Nick, defendant's Chief Executive Officer.(Grill Tr. P. 70; Eric Tr. P. 11; Nick Tr. P. 11)   Nick invited plaintiff to lunch.(Grill Tr. P. 70; Nick Tr. P. 49-50)   During lunch, Nick asked plaintiff to work at defendant.(Grill Tr. P. 70; Nick Tr. P. 53) It was Nick's decision that plaintiff be hired.  Plaintiff was never advised that anyone else was involved in the process.  Nick, during his deposition, did not indicate that anyone else, including Jorge Christelot, was involved in the decision.(Nick Tr. P. 62-63, 71)

12.     Nick further stated to plaintiff that he believed that plaintiff could effectively communicate with accounts and bring credibility to the company.(Grill Tr. P. 73) Nick believed that plaintiff was a good manager and that he was qualified for the job that he was hired to perform.(Nick Tr. P. 67, 72) Nick was also impressed by the way that plaintiff had run Berkey.(Nick Tr. P. 72) Nick never told plaintiff that he wanted to increase sales and expected plaintiff would bring in one million  dollars in sales.(Grill Affidavit ¶26)

13.     Nick told plaintiff that he was very concerned about his business.  He indicated that

he had moved to Florida and left the business to his two sons, Elcid and Eric.  Nick told plaintiff that

he did not like the way his sons were running the business and that he was worried about his loss

of business.(Grill Tr. P. 73, 78; Nick Tr. P. 58)  There was no communication to the accounts, said

Nick.(Grill Tr. P. 78, 85-86) Alan Melconian (hereinafter "Alan") was not discussed.(Grill Affidavit

¶25)

   14. No response, other than that which may be otherwise contained herein.

   15. No response, other than that which may be otherwise contained herein.

   16. No response, other than that which may be otherwise contained herein.

   17. Plaintiff accepted employment at defendant as a result of Nick's representation that

he would not have to solicit Jill-Crest customers.  He was given the title of General Manager.(Grill

Tr. P. 74)

### Duties and Responsibilities

   18. During the meeting at which plaintiff was hired, Nick told plaintiff that he would be

the General Manager handling the whole lab, including sales.  At no time did Nick tell plaintiff that

sales would be his primary responsibility.(Nick Tr. P. 67)

   19. Sales was not necessarily plaintiff's function when he was hired by defendant.(Grill

Tr. P. 155-156) His job was to give credibility to defendant.  Plaintiff does not recall if Nick even

mentioned to him that he should increase sales.(Grill Tr. P. 156)

   20. More specifically, during plaintiff's employment as General Manager, he was

responsible for overseeing company operations, improving communications between defendant and

existing accounts, planning new marketing programs, attending monthly professional photography

meetings, attending state conventions, visiting existing accounts and setting up appointments to see

potential new accounts.(Exhibit 2 [Plaintiff's Interrogatory Response] #3)  In performing these duties, plaintiff reported directly to Nick.(Grill Tr. P. 83) He did not report to either Eric or Elcid.

21-24.  Plaintiff did work on sales to some extent.  He would review monthly sales statements to determine if volume of sales changed from month-to-month.(Grill Tr. P. 127-128, 156; Defendant's Exhibit D) Plaintiff denies that in 2001 the company's total gross sales decreased by nearly $230,000 in comparison with 2000.  The Sales Analysis Reports are not accurate.(Grill Affidavit ¶95-124)

25-26.  If plaintiff saw a decrease in month-to-month for a particular account, he would investigate further as to why.  For example, he would call the account.(Grill Tr. P. 128, 229) He would also discuss the issue with Eric.(Grill Tr. P. 223-224, 228-229) Plaintiff did not have complete discretion in approaching and handling sales.(Grill Affidavit ¶38)

27.       Sometimes losses could be seasonal.(Grill Tr. P. 128-129) January through March are the worst months of the year.(Grill Tr. P. 129; Eric Tr. P. 115) The fourth quarter is the heaviest time.(Grill Tr. P. 129; Nick Tr. P. 129-130) If plaintiff saw a drop in sales during the fourth quarter, he would call the account immediately.(Grill Tr. P. 130) However, Eric never told plaintiff that he needed to increase sales.

28-29.  While employed at defendant, plaintiff did many things to bring in new accounts. He solicited, over the telephone and made appointments with studios.(Grill Tr. P. 179, 190-192) He made contacts with prospective accounts at monthly meetings and conventions.(Grill Tr. P. 180) He also sent letters to accounts and prospective accounts.(Grill Tr. P. 187-188, 200-201, Exhibits 3 and 4)  While employed at defendant, plaintiff obtained the names of potential accounts from the PPGNY list, the telephone book and from his own memory.(Grill Tr. P. 188-189)

During an average week, plaintiff placed telephone calls several time per week.(Grill Tr. P. 195) This consumed several hours per week.(Grill Tr. P. 196) He would also make personal deliveries to several accounts and make visits to potential clients.(Grill Tr. P. 195-196, 197)

In mailings, plaintiff would sometimes advertise promotions.(Grill Tr. P. 202)  In order to increase sales, plaintiff, with Elcid's and Eric's permission, gave discounts to customers.(Grill Tr. P. 213-214)

While employed at defendant, plaintiff made several other contributions, which defendant ignores.  He wrote a Price Service Guide.(Grill Tr. P. 250; Exhibit 5)  It took plaintiff several months to write this document.(Grill Tr. P. 250-251) The service guide contained pricing increases.(Grill Tr. P. 254) It was plaintiff's idea to increase the prices.(Grill Tr. P. 256) Plaintiff estimates that the increases that he made in the price list, Price Service Guide, led to additional sales of $100,000.(Grill Tr. P. 249)

During plaintiff's employment, he reduced or eliminated discounts from accounts with marginal sales.  This led to a savings of $75,000.(Grill Tr. P. 262-263) Plaintiff concluded that marginal accounts did not warrant a particular discount.(Grill Tr. P. 262) Plaintiff calculates the savings, based upon his review of the sales analysis.(Grill Tr. P. 264)

During plaintiff's employment, he also created a new employee manual.(Grill Tr. P. 265-266; Exhibit 6) He also caused a change to be made to defendant's overtime policy.(Grill Tr. P. 268) This also resulted in a monetary savings to defendant.  Plaintiff estimates that the savings was approximately $75,000-$100,000.

Due to plaintiff's efforts to increase sales, while employed at defendant, he brought in approximately 20 to 25 new accounts.(Grill Tr. P. 163, 169) He knew most of these accounts from

his previous employment.(Grill Tr. P. 172) Plaintiff estimates that, during 2001, he brought approximately $400,000 in new sales to defendant.(Grill Tr. P. 239, 246) This was based on new accounts and existing accounts that increased business after plaintiff became employed at defendant.(Grill Tr. P. 247)  A listing of the accounts that plaintiff brought to defendant was provided during discovery.(Grill Tr. P. 174, Exhibit 7) They included Autumn Studios, Bob Rothman, Derek Studio, Deja Vu Studios in Westchester, Glen Mar Studio in New Jersey, Lewis Studio, Marquee Studio, Queens Bridal Studio and Spellman Studio.(Grill Tr. P. 176) Plaintiff also increased the sales of accounts that were doing business with defendant before his arrival.(Grill Tr. P. 174)

30.     Although, in an effort to legitimize its decision, defendant argues that sales were deficient it must be emphasized that this allegation was never an issue while plaintiff was working there.  Plaintiff  was given no sales goals or expectations, no one ever told him that sales were too low or not high enough.(Grill Tr. P. 214-215, 222; Nick Tr. P. 121)  Similarly, no one ever told him that he had to increase sales or that sales were insufficient.(Grill Tr. P. 215)

31-32.  Plaintiff disputes the characterization of the letter.  Plaintiff refers to the letter which speaks for itself.

## The Solicitation Issue

33.     Solicitation of a competitor's accounts is not something that frequently occurs in the photo lab industry.(Grill Tr. P. 116)

34.     Plaintiff is married to Diane Grill, his second wife.  Plaintiff married Diane Grill in 1984.(Grill Tr. P. 8)  Diane Grill, at all times relevant hereto, worked for a company named Jill-Crest Photo Labs, which is a competitor of defendant.

35.     At the time plaintiff was hired, Nick and he agreed that plaintiff would not have to solicit Jill-Crest accounts.(Grill Tr. P. 73, 107; Nick Tr. P. 66; Grill Affidavit ¶27-28)  Several months after plaintiff commenced his employment with defendant, Nick and plaintiff had a discussion about Jill-Crest.  Nick mentioned something about plaintiff going after Jill-Crest's accounts.  Plaintiff reminded Nick of their original agreement.(Grill Tr. P. 104-105) Nick seemed satisfied when plaintiff reminded him of it.  This was the only time that Nick told plaintiff to solicit Jill-Crest's accounts.(Grill Tr. P. 106)

36.     At no other time, did anyone at defendant ever tell plaintiff to solicit Jill-Crest's accounts.(Grill Tr. P. 106) Even Eric knew about the agreement between Nick and plaintiff not to solicit Jill-Crest accounts.(Eric Tr. P. 62, 65)  Nobody at defendant ever told plaintiff that his job would be in jeopardy if he did not solicit Jill-Crest's accounts.(Grill Tr. P. 139)

37.     The agreement between it and plaintiff, not to solicit customers of Jill-Crest, was simply a reaffirmation of what had been transpiring between defendant and Jill-Crest for years, according to Robert Larson, the President of Jill-Crest.(Larson Tr. P. 64-66)[5]

## Reduction in Plaintiff's Schedule

38.     In March 2002, defendant changed plaintiff's schedule to two (2) days per week, eight (8) hours per day.(Grill Tr. P. 271)

39.     Nick told plaintiff that his work schedule was being reduced.  No reason was given.(Grill Tr. P. 271-272) Plaintiff never found out why his schedule was reduced.(Grill Tr. P. 272)

40.     Nick relied upon the Statements of Income for January to March 2002 -- which are

---

[5]  Excerpts from the transcript of the deposition of Robert Larson are annexed to Marvin Grill's affidavit as Exhibit 8.

traditionally the slowest months and which were even more greatly affected by the aftermath of September 11th.(Nick Tr. P. 152) Nick did not remember if he even looked at comparable figures for 2001.(Nick Tr. P. 154)

Defendant claims that "the statements indicate that Tri-Color's gross sales in January and February 2002 totaled $282,392.00 while gross sales in January and February 2001 totaled $446,410.00."  Thus, defendant asserts that sales in those comparable periods dropped by $164,000.00.  A review of the actual documents, contained in Exhibit D, reveal that defendant is grossly mistaken.  The gross sales for January and February 2002, according to Exhibit D, totaled $382,392.00!  Thus, the actual difference was $64,000, far less than what defendant claims and insignificant coming immediately after September 11th.

41.    At the time, Nick believed that plaintiff was still doing a good job and did not want to lose him.(Nick Tr. P. 156)

42.    Defendant never advised plaintiff that it could not afford to keep him due to a decline in sales.(Grill Tr. P. 273) Nick never mentioned sales when he advised plaintiff of the reduced schedule.(Grill Tr. P. 273)

### The Rehiring of Alan Melconian

43.    Elcid made the decision to rehire Alan.(Eric Tr. P. 121; Elcid Tr. P. 35) Elcid did not consult with Nick about hiring Alan.(Nick Tr. P. 162-163)

44.    The decision to rehire Alan, who was twenty-five (25) years old, was made shortly after defendant reduced plaintiff's schedule.(Grill Tr. P. 274)

45.    Alan had previously worked for defendant.  Plaintiff believes that Alan had been fired.(Grill Tr. P. 274-275)

-10-

46.     No response, other than that which may be otherwise contained herein.

47.     No response, other than that which may be otherwise contained herein.

48.     No response, other than that which may be otherwise contained herein.

49.     No response, other than that which may be otherwise contained herein.

50.     At no time was plaintiff told that Alan was re-hired to address defendant's declining sales.  In fact, Alan was deposed and never stated that defendant enunciated that reason to him when it re-hired him.(Grill Affidavit ¶84)

51.     Nick had nothing to do with Alan's re-hiring.  This was a decision made entirely by Elcid.(Grill Affidavit ¶85)

52.     No response, other than that which may be otherwise contained herein.

53.     No response, other than no one ever told plaintiff that his employment was contingent upon his increasing sales.(Grill Affidavit ¶88)

54.     After plaintiff left defendant, Alan brought accounts with him.  Alan  had not originally departed defendant to pursue other interests.  He was fired and went to work for a competitor.  The alleged increase occurred because Alan brought the competitor's accounts with him.(Grill Tr. P. 292; Alan Tr. P. 75)[6]  Alan brought back approximately twenty (20) accounts totaling over $450,000 in revenue.(Alan Tr. P. 75)

## Termination

55.     On May 7, 2002, defendant terminated plaintiff's employment.(Exhibit 9 [Defendant's Interrogatory Response] #36)   Elcid told plaintiff that his services were

---

[6] The transcript of the deposition of Alan Melconian is annexed to defendant's motion papers as Exhibit J.

-11-

terminated.(Grill Tr. P. 285)   The record is very clear that Eric and Elcid made the decision to terminate plaintiff, not Nick.(Eric Tr. P. 128; Elcid Tr. P. 38)

56.   Defendant never advised plaintiff that he would be fired if sales did not improve.(Elcid Tr. P. 43)

57.   Elcid dismissed plaintiff, despite having no knowledge about what plaintiff was doing on a day-to-day basis.(Elcid Tr. P. 26)

58.   Defendant never gave plaintiff a reason for the termination.(Grill Tr. P. 286; Elcid Tr. P. 43) Eric and Elcid simply told Nick that they could handle the work themselves.(Nick Tr. P. 165) They only told Nick that they had decided to fire plaintiff.(Nick Tr. P. 166)

59.   No response, other than that which may be otherwise contained herein.

60.   Plaintiff believes that all of the acts discussed in his affidavit were discriminatory.(Grill Affidavit, generally)

### Sales Comparisons

61.   After plaintiff's employment ceased, defendant replaced him as General Manager with Alan. (Eric Tr. P. 122)

62-63.  Defendant's Exhibit D contains monthly statements from January 1, 2000 through June 30, 2003.  Defendant's fiscal year, we must remember, begins on July 1st.  These documents show a decrease in sales after plaintiff's dismissal.

Income from Sales Analysis
January 2000 - June 2003

| | 2000 | | 2001 | | 2002 | | 2003 |
|---|---|---|---|---|---|---|---|
| Jan | 197,418-2,575,717 | Jan (M) | 247,695-2,477,219 | Jan (M) | 150,765-2,375,412 | Jan (A) | 193,882-2,312,736 |
| Feb | 237,528-2,811,899 | Feb (M) | 198,715-2,675,934 | Feb (M) | 231,627-2,607,039 | Feb (A) | 198,071-2,510,807 |
| Mar | 286,186-3,098,085 | Mar (M) | 270,229-2,946,163 | Mar (M) | 277,426-2,884,465 | Mar (A) | 253,364-2,764,171 |
| Apr | 296,742-3,391,781 | Apr (M) | 248,364-3,194,527 | Apr (M) | 308,570-3,193,035 | Apr (A) | 312,046-3,076,217 |
| May | 377,669-3,815,546 | May (M) | 379,119-3,573,646 | May | 343,715-3,536,750 | May (A) | 322,553-3,398,770 |
| Jun | 417,777-**4,243,722** | Jun (M) | 376,434-**3,950,080** | Jun (A) | 287,712-**3,824,462** | Jun (A) | 343,911-**3,742,681** |
| Jul | 325,791-325,791 | Jul (M) | 344,349-344,349 | Jul (A) | 345,768-345,768 | | |
| Aug | 332,420-658,211 | Aug (M) | 311,786-656,135 | Aug (A) | 325,055-670,823 | | |
| Sept | 360,581-1,018,792 | Sept (M) | 324,409-980,544 | Sept (A) | 311,145-981,968 | | |
| Oct | 418,482-1,437,274 | Oct (M) | 461,831-1,442,375 | Oct (A) | 406,279-1,388,247 | | |
| Nov | 490,204-1,927,478 | Nov (M) | 453,494-1,895,869 | Nov (A) | 411,807-1,800,054 | | |
| Dec | 302,046-2,229,524 | Dec (M) | 328,778-2,224,647 | Dec (A) | 318,795-2,118,849 | | |

(M) = Marvin Grill
(A) = Alan Melconian

62-63.  This chart shows that defendant's sales did not increase to any significant extent, if at all, after plaintiff's dismissal.  If anything, sales decreased.  For fiscal year July 1, 2002 to June

-13-

30, 2003, after plaintiff's dismissal, sales actually decreased according to defendant's own Exhibit D.

62-63.  The fact that sales decreased after plaintiff's dismissal is also confirmed by defendant's Exhibit E, Statements of Operations.  These statements indicate that the income from net sales for the fiscal  year ended were as follows:

| Year | Income from Net Sales |
|------|----------------------|
| 1998 | $3,801,463 |
| 1999 | $3,990,616 |
| 2000 | $4,232,837 |
| 2001 | $3,985,044 |
| 2002 | $3,824,462 |
| 2003 | $3,742,681 |

As can be seen, the income from net sales actually decreased between fiscal year ended 2002 and fiscal year ended 2003.

64-66.  Defendant's Exhibit E speaks for itself.

67.    During plaintiff's employment, defendant had approximately fifty-seven (57) employees.(Eric Tr. P. 13; Nick Tr. P. 19)

68.    As soon as plaintiff began his employment with defendant, he quickly became aware of Eric and Elcid's deficient performance.  During the time that plaintiff was employed at defendant, approximately twenty-five (25) to thirty (30) accounts complained to him that there had been insufficient communication from Eric and Elcid, prior to the commencement of plaintiff's employment.(Grill Tr. P. 87-88)

69.    Plaintiff was not given any sales requirement quotas or targets.(Grill Tr. P. 160-161;

-14-

Eric Tr. P. 88-89; Elcid Tr. P. 25; Nick Tr. P. 100)  At no time did anyone at defendant tell plaintiff that there were sales expectations or that he had to meet any requirement.(Grill Tr. P. 161) In fact, plaintiff was never given any specific instructions about how to perform his job.(Grill Tr. P. 161)

70.     In the beginning of 2002, defendant lost a major account – Glen Mar Studio -- because of Elcid's failure to return telephone calls.(Grill Tr. P. 181-184)

71.     During plaintiff's employment with defendant, no one ever complained to him about his job performance.(Grill Tr. P. 222; Eric Tr. P. 109-110) This includes clients.(Grill Tr. P. 222) Defendant never advised plaintiff that he was not performing his job to its satisfaction.(Elcid Tr. P. 41)

72.     Nick did not find fault with anything that plaintiff did while employed by defendant. There was never any discussion between Nick and his sons that plaintiff was doing anything wrong. Nick did not believe that plaintiff was doing anything wrong.(Nick Tr. P. 120)

73.     Nick testified that plaintiff's unwillingness to solicit Jill-Crest's accounts had nothing to do with his being dismissed.(Nick Tr. P. 87, 170)  Very simply, the Jill-Crest issue was not an issue while plaintiff was working for defendant and defendant should not be permitted to make it an issue after the fact.

74.     In fact, at no time in plaintiff's career, did he ever solicit or attempt to solicit clients of competitors of his employers.(Grill Tr. P. 117) Plaintiff considered it bad business to solicit the accounts of others.(Grill Tr. P. 143)

75.     The distinction that defendant fails to draw is between visiting accounts of competitors versus soliciting accounts.(Grill Tr. P. 118) The purpose of these visits is to say "Hello" and let accounts know that, if they are unhappy with their present service, they would know who to

call.(Grill Tr. P. 120) Visiting was part of the routine.(Grill Tr. P. 120)

76.     Plaintiff attempted to obtain accounts who were unhappy with their present finisher, but only on that basis.(Grill Tr. P. 117)

77.     Nick testified that he did not have any problems with the way that plaintiff was soliciting customers other than what may or may not have been the case with Jill-Crest.  Moreover, Elcid and Eric never complained to Nick about the way in which plaintiff solicited customers.(Nick Tr. P. 101-102)

78.     Plaintiff did not believe that it was good business practice to ask a customer if it was being solicited by a competitor.(Grill Tr. P. 134-135)

79.     It was not unusual for a customer to have an account with more than one lab.(Grill Tr. P. 136) That's the nature of the business.(Grill Tr. P. 136-137)

80.     Plaintiff is not aware of any accounts that defendant lost due to competitor's solicitations while at defendant.(Grill Tr. P. 126)

81.     When plaintiff was hired, he worked five (5) days per week, eight (8) hours per day.(Grill Tr. P. 270-271)

82.     Prior to being terminated, plaintiff did not believe that his job was in danger (Grill Tr. P. 289) and was never given any such notice.(Grill Tr. P. 300; Eric Tr. P. 129; Elcid Tr. P. 30-31) No one ever told plaintiff that they were dissatisfied with him.(Nick Tr. P. 110-111)

83.     Nick's testimony is supportive of plaintiff's claim.  Nick considered plaintiff to have been "laid off", not fired because he did not do anything wrong, according to Nick.(Nick Tr. P. 168)

84.     The record contains a host of financial documents.  Some of these documents are attached to defendant's motion as Exhibit D (Statements of Income), Exhibit  E (Statements of

-16-

Operations) and Exhibits L-O (Period Sales Analysis Reports).

85.     The record reveals that some of these documents were utilized by the Melconians to a greater extent than others.  Exhibit D, the Statements of Income, are the documents that Eric and Elcid regularly sent to Nick on a monthly basis.(Eric Tr. P. 21, 24) These forms indicate whether defendant made a profit of loss for a particular month.(Eric Tr. P. 24) Although it was this document that the Melconians regularly reviewed, defendant, in its motion, essentially ignores this document in making its argument.

86.     This document includes retail sales and amateur sales.(Eric Tr. P. 31) It is net of discounts and returns.(Eric Tr. P. 31) It reflects the revenues received from sending out invoices, from film sales, amateur sales, professional merchandise and walk-in sales.  Discounts are deducted.(Eric Tr. P. 33-34) Returns are also deducted.(Eric Tr. P. 35)

87.     Instead, defendant emphasizes Exhibits L-O, the Period Sales Analysis Reports. These are sales reports on a per customer basis – per quarter, per customer.(Eric Tr. 36)

88.     Although defendant now attempts to cite declining sales figures, it is very clear that prior to defendant's decision to terminate plaintiff, the Melconians did very little to study these documents and were, in fact, very uninformed as to the true nature of the sales situation.

89.     For example, Eric was not sure that defendant had experienced a loss of sales prior to January 2001.(Eric Tr. P. 48)

90.     Nick was not aware if Jill-Crest took any customers away from plaintiff.(Eric Tr. P. 67-68)

91.     In determining loss of sales during plaintiff's employment, Eric did not look at many of the documents that defendant now claims are relevant.(Eric Tr. P. 82-85)

-17-

92.     Eric never attempted to ascertain whether any customers were lost (Eric Tr. P. 87-88) during plaintiff's employment. Elcid was not aware of any accounts that were lost during plaintiff's employment.(Elcid Tr. P. 24) Moreover, Nick was not aware of any accounts that defendant lost during plaintiff's employment.(Nick Tr. P. 97)

93.     Eric nor anyone else, to his knowledge, made any effort to determine the new accounts that plaintiff brought in.(Eric Tr. P. 90-91)

94.     Alan ultimately left and was replaced by one Dominick DiCarlo.(Eric Tr. P. 127) Eric did not even know if there was a loss of business after Alan left.(Eric Tr. P. 127)

95.     In the record, defendant has continuously claimed an alleged loss of $230,000 in business. However, neither could state how this alleged loss was calculated.(Eric Tr. P. 136; Elcid Tr. P. 41)

96.     Nick did not even know if plaintiff was responsible for any loss of sales.(Nick Tr. P. 158)

97.     The Melconians' lack of information during and subsequent to plaintiff's employment must lead one to question the credibility of its argument.(Grill Affidavit ¶110)

98.     Defendant never considered the effect that the events of September 11th had on the industry, in general, and defendant, in particular.(Nick Tr. P. 153) September 11th occurred during the middle of plaintiff's employment. Up until September 11th, defendant concedes that things were "okay." Nick even testified that 2001 was a good year.(Nick Tr. P. 129)

99.     The last four (4) months of the year is when the majority of sales come into play. September 11th caused business and sales to suffer for the balance of 2001.(Grill Tr. P. 240)

100.    Plaintiff has formed this opinion based upon discussions with professional

-18-

photographers who told him that their business had dropped off dramatically after September 11th.(Grill Tr. P. 241)

101.    Mr. Larson, the President of Jill-Crest, also noted, during his deposition, that the attacks of September 11th had a negative affect on the industry.(Larson Tr. P. 72-73)  The events of September 11th, he said, negatively affected sales in the industry through 2002.(Larson Tr. P. 73-74) Many jobs were canceled.(Larson Tr. P. 74)

102.    Plaintiff believes that he was fired because of his age.(Grill Tr. P. 290)

Dated: Jericho, New York
        June 9, 2005

                                        Respectfully submitted,
                                        WOLIN & WOLIN ESQS.

                                        /S/_____
                                        By: Alan E. Wolin, Esq.
                                        Attorney for *Plaintiff*
                                        420 Jericho Turnpike, #215
                                        Jericho, New York 11753
                                        Telephone: (516) 938-1199
                                        Facsimile: (516) 938-1178

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
MARVIN GRILL,                               :          Civil Action No. CV 03 3512
                                            :
                         *Plaintiff*,       :
                                            :
          - against -                       :          **Affidavit of Service**
                                            :
TRIANS PHOTO LABS, INC. d/b/a               :
TRI COLOR IMAGING                           :
                                            :
                         *Defendant*.       :
------------------------------------------------------X

State of New York, County of Nassau  )ss.:

        JILL ANN FIEMAN, being duly sworn, deposes and says:

        Deponent is not a party to the action, is over the age of 18 years and is a resident of the State of New York.

        On the 13th day of June, 2005, deponent served a copy of the within **Plaintiff's Rule 56.1 Counter-Statement**

**UPON:**        Steven Seltzer, Esq.
                 Miranda & Sokoloff LLP
                 240 Mineola Boulevard
                 Mineola, NY  11501

by electronic mail to sseltzer@mirandasokoloff.com and by overnight delivery via United Parcel Service.

                                                    /S/_____
                                                    JILL ANN FIEMAN

Sworn to before me this
13th day of June, 2005

/S/_____
Notary Public
Jerold D. Wolin
Notary Public, State of New York
No. 4679412
Qualified in Suffolk County
Commission Expires September 30, 2006